UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>D-1 ALVAREZ MOULTRIE,<br>D-2 MALIK TURNER,<br>D-3 WILLIE BEE BRANCH,<br>Defendants. | Case No. 25-cr-20608<br>Honorable Robert J. White |

**ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS**

## I. Introduction

Before the Court is Defendant Willie Bee Branch's motion to suppress evidence obtained through a series of wiretaps conducted by the Federal Bureau of Investigation ("FBI") as part of an investigation into an alleged cocaine trafficking conspiracy involving fifteen total defendants. Branch believes that the affidavits supporting the wiretaps did not establish probable cause, and that the Government failed to adequately explain why traditional investigative methods would not have been sufficient. Seemingly, he also argues that the wiretaps violated the Fourth Amendment because they allowed law enforcement to intercept conversations

involving individuals who were not suspected of criminal activity when the orders were issued.

Defendants Malik Turner and Alvarez Moultrie have joined Branch's motion and filed supplemental briefs. Moultrie largely reiterates Branch's challenges to probable cause and necessity, extending those arguments to the successive wiretaps, including a July 23, 2025 order authorizing interception of Turner's telephone. Turner, by contrast, does not independently challenge the probable cause supporting that order. Instead, he focuses on necessity, arguing that investigators failed to adequately consider available alternatives, including investigative opportunities arising from his federal supervised release. The Government maintains that the wiretap orders satisfied Title III's requirements. The Court held a hearing on the motions in open court on October 26, 2026. For the reasons stated below, because the affidavits in support of wiretap applications contain probable cause and demonstrate necessity, Defendants' motions will be denied.

**II. Background**

The investigation began, not with Branch, Turner, or Moultrie, but with another alleged co-conspirator: Elisabeth Cooney. (ECF No. 276, PageID.1616). The FBI's Mid-Michigan Safe Streets Task Force ("MMSSTF") began investigating

Cooney's suspected drug trafficking in March 2024. (Ex. 1, D3-000831)[1]. Between March and December 2024, investigators conducted nine controlled purchases of cocaine involving Cooney. (ECF No. 276, PageID.1616).

On January 28, 2025, the Government obtained authorization to intercept communications over two telephones associated with Cooney. (*Id.* at PageID.1616–17). Investigators came to suspect a supply chain running from Cooney to Levail Buriel, a co-defendant. (*Id.* at PageID.1617). The investigation also produced evidence suggesting that Branch and Turner separately supplied Buriel. (Ex. 3, D3-001188). It is alleged that Moultrie supplied Turner. (ECF No. 276, PageID.1617).

The investigation ultimately resulted in eight court authorized wiretaps between January and August 2025. (*Id.* at PageID.1616). The present motions concern the orders issued on June 23, July 10, and July 23 of 2025. (*See* ECF Nos. 217, 247, 269). Each application was supported by an affidavit from FBI Special Agent Joshua Paczok. (*See generally* Ex.1 (the June 23, 2025 Order), Ex. 2 (the July 10, 2025 Order), Ex. 3 (the July 23, 2025 Order)). Because Defendants dispute Paczok's interpretations of intercepted conversations, the Court recounts the underlying investigation and evidence collected in detail.

**A. June 23, 2025 Wiretap**

[1] Because the wiretap applications are under seal, the Court will cite the pertinent applications in the above fashion.

On June 23, 2025, the Government applied for an order extending interception of calls from "Target Telephone 9," belonging to Siler, and authorizing the initial interception of "Target Telephone 11," belonging to Buriel. (Ex. 1, D3-000797). The application sought evidence concerning several suspected drug offenses, including violations of 21 U.S.C. §§ 841, 843, and 846. (*Id.* at D3-000817).

The affidavit also disclosed that, on March 5, 2025, the Michigan State Police Bay Area Narcotics Enforcement Team ("BAYANET") searched Siler's Wheeler Street residence and associated storage units and seized distribution amounts of suspected cocaine and fentanyl. (*Id.* at D3-000822–000823). This discovery supplied additional context for the later conversations involving Siler, Hayes, and Buriel.

Providing additional support for the application, Paczok described the investigation into Cooney and the information obtained through earlier interceptions. (*Id.* at D3-000831–000836). According to him, those interceptions revealed communications connecting Cooney to Davis, Davis to Hayes, and Hayes to Siler. (*See generally id.* at D3-000831–000845). The affidavit then described communications suggesting that Siler obtained cocaine from Buriel. (*Id.* at D3-000856–000870). Based on those conversations and other information previously developed during the investigation, Paczok believed that Buriel was supplying cocaine to Siler. (*Id.* at D3-000866).

The affidavit also discussed the investigative methods law enforcement had already used or considered but had not attempted, including confidential sources, controlled purchases, physical surveillance, telephone records, previous interceptions, etc. (*Id.* at Bates D3-000873–000883). Paczok explained that those methods had helped identify suspected participants but had not revealed all of their suppliers, customers, or the locations where narcotics and proceeds were stored. (*See id.* at D3-000873–000883).

Based on this information, the Government sought authorization to begin intercepting Buriel's telephone and to continue intercepting Siler's telephone. (*Id.* at D3-000797). The application was approved on June 23, 2025. (ECF No. 276, PageID.1617).

Branch, in particular, challenges this order because communications intercepted over Buriel's telephone subsequently became part of the basis for the July 10 application involving Branch. (*See generally* ECF No. 217).

**B. July 10, 2025 Wiretap**

On July 10, 2025, the Government sought authorization to intercept Target Telephones 12 and 13. (Ex. 2, Bates D3-000946). The application described the user of Target Telephone 13 as an unknown male, but investigators subsequently attributed those phones to Branch. (*Id.* at Bates D3-000944; ECF No. 276, PageID.1617).

The supporting affidavit explained that investigators believed Buriel was obtaining cocaine from a supplier. (Ex. 2, D3-001008). In support of that belief, Paczok included many of the previous calls used to establish probable cause for the June 23, 2025 wiretap order, and also described several additional intercepted calls involving Buriel, Siler, Hayes, and the unidentified male in ownership of Target Telephone 13 (Branch). (*Id.* at D3-001008–001022).

One of the conversations, for example, concerned an apparent shortage of money that Hayes allegedly owed to Buriel. (*Id.* at D3-00101–001015). During a call between Siler and Hayes, the following exchange occurred:

> Siler: Our boy said that motha fucka five thousand light man.
>
> Hayes: Five?
>
> Siler: Yup.
>
> Hayes: Alright, I got you bro you know that, you know I ain't goin never play you man. I got you.
>
> Siler: Nah, nah, nah, nah, I'm cool, you know what I mean I just, just got the call.

(*Id.* at D3-001015).

Paczok believed that the conversation concerned a $5,000 shortage in money owed for cocaine. (*Id.* at D3-001016). He based that interpretation on his training and experience, his knowledge of the investigation, and the context of the intercepted communications. (*Id.* at D3-001015). Indeed, Paczok's interpretations based on his

personal experience would be a recurring theme throughout most of the conversations intercepted in the various wiretaps.

The affidavit also described conversations involving Buriel and Branch that Paczok believed concerned narcotics transactions. (*Id.* at D3-001016–001022). According to Paczok, the timing and substance of those conversations supported his belief that the targeted telephones were being used to facilitate drug trafficking.

The affidavit again addressed why investigators believed additional interception was necessary and why other investigative techniques were not sufficient on similar grounds to those provided in the June 23, 2025 affidavit. (*Id.* at D3-001028–001054).

The Government obtained the requested interception authorization on July 10, 2025. (ECF No. 276, PageID.1617).

**C. July 23, 2025 Wiretap**

The investigation continued after the July 10 order. On July 23, 2025, the Government sought to extend interception of Buriel's Target Telephone 11 and begin intercepting Target Telephone 14, which investigators attributed to Turner. (Ex. 3, D3-001094).

Investigators believed that Branch and Turner were both suppliers to Buriel. (ECF No. 276, PageID.1617). And the affidavit described several intercepted calls involving Buriel, Branch, Turner, and others lower on the drug distribution chain

that Paczok believed concerned cocaine transactions, although many of these conversations had been reproduced in either the June 23 or July 10, 2025 wiretap affidavits. (*See* Ex. 3, D3-001125–001161).

Just one of the newer conversations picked up after the July 10 wiretap order occurred on July 17, 2025, when Turner contacted Buriel. (*Id.* at D3-001158). During the call, the following exchange occurred:

> Turner: Okay. I got one laying around for fifteen five for you if you want it.
>
> Buriel: You say what now?
>
> Turner: I said I got one laying around for fifteen five for you man if you want it.
>
> Buriel: Uh, okay, um (UI).
>
> Turner: Yep.
>
> Buriel: Just give me, minute (UI). I'm, I'm, I'm about to knock this little stuff out and um, I'll slide by.
>
> Turner: Just give me a call.

(*Id.*).

Paczok believed that Turner was offering to sell Buriel one kilogram of cocaine for $15,500. (*Id.* at D3-001158–001159). He interpreted "one" as a reference to one kilogram of cocaine and "fifteen five" as a reference to $15,500. (Id. at D3-001159). Paczok explained that this amount was "consistent with the general price range that a narcotics supplier would pay for one kilogram of cocaine." (*Id.*). He also

believed that Buriel's statement that he would "slide by" meant that Buriel intended to meet Turner to complete the sale. (*Id.*).

Paczok again explained why the wiretaps were necessary and why other standard investigative methods were insufficient, although much of this section was reproduced from or similar to the June 23 or July 10 wiretap orders. (*Id.* at D3-001163–001190). And Paczok further explained why investigators believed they needed to intercept Turner's telephone, rather than continue relying on existing interceptions of Buriel's and Branch's telephones:

> "Malik Turner is a separate supplier to Levail Buriel. I am not aware of any direct connection between Willie Branch and Malik Turner, so I do not expect to gain evidence against Malik Turner from the interceptions of Target Telephone 13."

(*Id.* at D3-001188).

Paczok explained that interceptions over Branch's telephone were unlikely to reveal Turner's suppliers or the locations where Turner stored narcotics. (*Id.*). He also believed that monitoring Buriel's telephone would not reveal who Turner's suppliers were because Turner would likely be wary of disclosing those who supplied him to someone he was directly supplying with narcotics. (*Id.* at D3-001187).

The affidavit also explained that investigators did not know whether Branch and Turner were Buriel's only suppliers, and investigators had not confirmed where Buriel stored narcotics or the proceeds of his suspected drug sales. (*Id.* at D3-

001188). Paczok believed that continuing interception of Buriel's telephone while beginning interception of Turner's telephone would assist investigators in answering those remaining questions. (*Id.* at D3-001188–001189).

**D. The Motions to Suppress**

On July 16, 2026, Branch filed the present motion to suppress wiretap evidence. (ECF No. 217). He challenges the probable cause and necessity supporting the interception orders and seeks suppression of evidence derived from those interceptions. (*See generally id.*).

Turner joined Branch's motion on July 29, 2026. (ECF No. 233). In his supplemental brief, Turner specifically challenges the necessity of the July 23 order, seeks suppression of evidence derived from earlier interceptions, and requests records supporting the attribution of Target Telephone 14 to him. (*See generally* ECF No. 269).

Moultrie joined Branch's motion on July 31, 2026, and later filed a supplemental brief as well. (ECF No. 234; ECF No. 247). His arguments are virtually the same as Branch's and argues that the Government improperly relied on suspected criminal activity involving other individuals to justify successive interceptions. (*See generally* ECF No. 247).

The Government filed its combined response on October 13, 2026. (ECF No. 276). It argues that the challenged orders were supported by probable cause, that the

affidavits established necessity, and that Defendants have not demonstrated a basis for suppression. (*See generally id.*).

**III. Legal Standard**

The Government's use of wiretaps is governed by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. §§ 2510–23. As the Sixth Circuit has explained, "[t]he basic standards for a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III," which creates additional hurdles before a wiretap may be granted. *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). Therefore, Title III allows law enforcement to intercept telephone communications only when certain requirements are met: "(1) probable cause to believe that the targeted individual engaged or will engage in criminal activity; (2) that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous'; and (3) the wiretap application includes 'a full and complete statement' in that regard." *United States v. Turner*, No. 22-5046, 2024 WL 3634454, at *2 (6th Cir. Aug. 2, 2024), *cert. denied sub nom. Stewart v. United States*, 145 S. Ct. 783, 220 L. Ed. 2d 280 (2024), *and cert. denied sub nom. Bibbs v. United States*, 145 S. Ct. 785, 220 L. Ed. 2d 281 (2024).[2]

---

[2] Branch and Moultrie also correctly observe that the good faith exception recognized in *United States v. Leon*, 468 U.S. 897 (1984), does not apply to wiretap orders issued in violation of Title III. (ECF No. 217, PageID.887–88; ECF No. 247,

Of those three requirements, only the first two are important here: probable cause and necessity.

**A. Probable Cause**

Before authorizing a wiretap, the issuing judge must find probable cause to believe that an individual is committing, has committed, or is about to commit one of the offenses enumerated in the statute. 18 U.S.C. § 2518(3)(a); *see also Turner*, 2024 WL 3634454, at *2. The judge must also find probable cause to believe that particular communications concerning the offense will be obtained through the interception and that the targeted telephone is being used, or is about to be used, in connection with the identified offense. *Id.* at § 2518(3)(b), (d).

The probable cause standard is a familiar one, and, indeed, when reviewing Title III orders for probable cause, a court is to apply a similar standard to that used to evaluate search warrants. *See Turner*, 2024 WL 3634454, at *2 (citing *Alfano*, 838 F.2d at 161–62). The Fourth Amendment requires that warrants be supported by probable cause, but the Supreme Court has recognized that probable cause is "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v.*

---

PageID.1366) The Sixth Circuit has expressly held that "the good-faith exception to the warrant requirement is not applicable to warrants obtained pursuant to Title III." *United States v. Rice*, 478 F.3d 704, 711 (6th Cir. 2007). The Government does not invoke *Leon's* good faith exception.

*Pringle*, 540 U.S. 366, 371 (2003) (citing *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). But "[p]robable cause 'is not a high bar'" to clear. *D.C. v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). And "[c]ertainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (citing *Alfano*, 838 F.2d at 162). Overall, the affidavit supporting a wiretap application is to be reviewed "on the totality of the circumstances and in a reasonable and common sense manner," and "great deference" is to be given the issuing judge's determination that probable cause existed to issue the interception order because that judge was "in the best position to determine all of the circumstances in the light in which they may appear at the time." *Alfano*, 838 F.2d at 161–62 (citations omitted).

**B. Necessity**

Even where probable cause exists, Title III requires something more. The Government must also demonstrate that the interception is necessary.

Specifically, each application must include:

> "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;"

18 U.S.C. § 2518(1)(c).

The issuing judge must then determine that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if

tried or to be too dangerous." *Id.* at § 2518(3)(c). As the Sixth Circuit has explained, this requirement "helps ensure that wiretaps are not 'used thoughtlessly or in a dragnet fashion.'" *United States v. Fordham*, 183 F.4th 442, 456 (6th Cir. 2026) (quoting *Alfano*, 838 F.2d at 163).

But to make this showing, law enforcement is not required to prove "that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163 (citing *United States v. Brown*, 761 F.2d 1272, 1275 (9th Cir.1985)). Rather there are three criteria that a Title III application must satisfy: "(1) the wiretap cannot be 'the initial step' in an investigation, (2) 'traditional investigative techniques' must be inadequate under the circumstances, and (3) investigators' reliance on past experience in addressing the necessity of a wiretap must be tied to the 'particular facts of the case.'" *Fordham*, 183 F.4th at 456 (quoting *United States v. Gardner*, 32 F.4th 504, 515 (6th Cir. 2022)).

Like with the probable cause determination, "[a]n assertion that a wiretap application fails Title III's necessity requirement 'attacks *the issuing* district court's determination.'" *Id.* (quoting *Gardner*, 32 F.4th at 514) (emphasis in original). That determination is also afforded great deference. *See id.* (citing *Alfano*, 838 F.2d at 162).

**IV. Analysis**

The Court addresses the orders chronologically. Branch challenges the probable cause and necessity supporting the June 23 and July 10 applications. Turner joins that challenge and separately contests the necessity of the July 23 authorization to intercept his telephone. Moultrie joins both defendants and largely repeats Branch's arguments concerning probable cause and necessity, applying them to the successive interceptions of Buriel's, Branch's, and Turner's telephones. (*See generally* ECF Nos. 217, 233, 234, 247, 269). So the Court will address probable cause and necessity for each order before turning to the Defendants' remaining arguments.

**A. The June 23, 2025 Wiretap Order**

**1. Probable Cause**

Turn to the June 23, 2025 wiretap order. The order extended interception of Target Telephone 9, used by Siler, and authorized the initial interception of Target Telephone 11, used by Buriel. Branch argues that the Government's theory becomes more attenuated with each step away from Cooney, against whom multiple investigative techniques had been employed to determine her involvement in a drug trafficking conspiracy. (ECF No. 217, PageID.884). Although investigators conducted controlled purchases from Cooney, he argues, they did not independently establish that each person subsequently identified through intercepted

communications was engaged in drug trafficking. (*Id.*). Moultrie makes essentially the same argument. (ECF No. 247, PageID.1362–63).

The Court agrees with one part of that argument. Evidence that Cooney sold cocaine cannot simply be passed along a chain of individuals associated with her until it becomes probable cause to wiretap either Target Telephones 9 or 11. After all, § 2518(3) requires probable cause to believe that a specific individual "is committing, has committed, or is about to commit a particular offense." 18 U.S.C. § 2518(3)(a). But the Court cannot read each conversation as though the preceding investigation never happened. That is because probable cause rests on the "totality of the circumstances." *Pringle*, 540 U.S. at 371. And the Sixth Circuit has recognized that a "recurring pattern of multiple connections among the phone calls," and a "succession of superficially innocent events," may support a Title III order, especially if "a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *Alfano*, 838 F.2d at 162–63 (citations omitted).

Importantly, at the hearing, counsel for all three Defendants agreed that probable cause existed to intercept Cooney's telephone communications. So there is no dispute that the sufficient evidence existed to justify the interception of Cooney's communications. Their disagreement concerns whether the evidence developed through that investigation established probable cause to intercept the telephones of

individuals subsequently identified as suspected participants in the drug trafficking activity.

But the Defendants' concession is still significant: although probable cause to intercept Cooney's communications cannot alone justify the subsequent wiretaps, the evidence obtained during that investigation establishes context to determining whether the later applications independently satisfied Title III's requirements.

And the earlier investigation supplied substantial context. Investigators conducted nine controlled purchases of cocaine from Cooney, and successive interceptions and surveillance identified suspected supply relationships involving her, Davis, Hayes, and Siler. (Ex. 1, D3-000831–000845). The affidavit also reported that a March 5 search of Siler's residence and associated storage units yielded "[d]istribution amounts of suspected cocaine and fentanyl." (*Id.* at D3-000822–000823). These facts provided an independent basis to suspect Siler of drug trafficking and gave significance to his later communications with Hayes and Buriel.

More importantly, the affidavit described communications linking the two target telephones to suspected transactions. On April 28, Hayes called Siler, who said he would "make a call real quick." (*Id.* at D3-000841). Telephone records showed that Siler immediately called Buriel's Target Telephone 11, received a return call from that telephone, and then called Hayes back. (*Id.* at D3-000841–000842). Siler told Hayes that someone was coming to meet him shortly, and Hayes asked what the

"ticket" would be. (*Id.* at D3-000842). Paczok interpreted the exchange as Siler contacting Buriel to arrange a cocaine supply for Hayes. (*Id.* at D3-000843). That interpretation was supported by the sequence of the calls; not just Paczok's interpretation from his own experience. The affidavit also identified toll records indicating frequent contact between Hayes, Siler, and Buriel. (*Id.* at D3-000845–000846).

The pattern of calls continued in late May. On May 28, Buriel called Siler and asked whether he would "be ready tomorrow for sure." (*Id.* at D3-000856). To which, Siler confirmed that he would. (*Id.*) Later that evening, Hayes asked Siler whether he had "anything good your way," and Siler answered that he would have something "tomorrow fo show." (*Id.* at D3-000858). When Hayes followed up on May 29 and May 30, Siler again said he needed to contact someone. (*Id.* at D3-000858–000859). Immediately after the May 30 conversation with Hayes, Siler attempted to call Buriel's telephone twice. (*Id.* at D3-000860). Read together, these calls supported Paczok's inference that Hayes was awaiting cocaine from Siler, who was in turn awaiting a supply from Buriel. (*Id.*). And the affidavit identifies several more calls between Hayes, Siler, and Buriel that Paczok believes are indicative of drug trafficking. (*Id.* at D3-000860–000870).

Surveillance provided additional corroboration for Paczok's claims. As one example, on June 6, investigators observed Hayes arrive at Siler's residence. (*Id.* at

D3-000879). While Hayes was there, Siler walked to Buriel's nearby residence on Kollen Street and returned shortly afterward, with Hayes departing shortly thereafter. (*Id.*). A similar sequence of events unfolded on June 16. Siler told Hayes he needed to "make a call right quick." (*Id.* at D3-000862). Shortly thereafter, he called Buriel and asked, "How we looking?" to which Buriel answered, "I got it right now if you want to do it right now." (*Id.* at D3-000863). Siler immediately called Hayes and asked how quickly he could arrive, and Hayes responded that he needed to "grab that money right quick" and would come "like ASAP." (*Id.* at D3-000864). Surveillance then recorded Hayes stopping at an address, before leaving again, and arriving at Siler's residence. (*Id.* at D3-000865–000866). Buriel also called Siler to seemingly coordinate a meeting around this time. (*Id.* at D3-000865–000866). Like the other interactions between Hayes, Siler, and Buriel, Paczok understood these exchanges to be cocaine transactions.

Between these communications, the surveillance evidence, and the context from the wiretapped communications and controlled buys involving Cooney and the March 5 search of Siler's residence, there is plenty here to establish probable cause that the Target Telephones at issue were being used in the commission of drug related crimes. True, Paczok's interpretation of these events, standing alone, would not be enough. *United States v. Ayala-Vieyra*, No. 21-1177, 2022 WL 190756, at *3 (6th Cir. Jan. 21, 2022) ("[T]he issuing judge should not simply accept an officer's

speculation…”) (citing *United States v. Jackson*, 454 F. App’x 435, 439 (6th Cir. 2011)). But these events gave the issuing judge more than Paczok’s unsupported interpretation of ambiguous conversations. The affidavit described repeated, closely timed communications among the same participants, references to availability and payment, and movements consistent with drug transactions. The March 5 seizure and the evidence developed through earlier interceptions involving Cooney supplied key context for why conversations involving Hayes, Siler, and Buriel were not simply innocent.

Branch and Moultrie point out that the affidavit identifies the Defendants as part of a drug trafficking organization, or “DTO.” (*Id.* at D3-000829). They argue that there is no evidence that the Defendants are part of a DTO, and “without there being evidence of an organization, there is no basis…to use the evidence developed about one individual and apply it against the other individuals who were not directly involved….” (ECF No. 217, PageID.884; ECF No. 247, PageID.1362.) But Title III does not require proof of a formal organization to establish probable cause or to use previous investigations into co-conspirators for context. The question is simply whether the evidence establishes a fair probability that the two specified target telephones would carry communications concerning the enumerated drug offenses. *See* 18 U.S.C. § 2518(3)(a)–(d); *see also Turner*, 2024 WL 3634454, at *2. And as stated before, the intercepted communications supported a wiretap extension as to

Target Telephone 9 and the initial interception of Target Telephone 11. Taken together with the earlier investigation, the issuing judge had enough to establish probable cause for the wiretap.

**2. Necessity**

Turn now to necessity. Branch argues that investigators had succeeded with informants, controlled buys, surveillance, and other ordinary methods against Cooney but did not adequately try those methods against Buriel.[3] (ECF No. 217, PageID.880–84). The Court addresses each factor outlined in *Fordham*.

First, the wiretap was not the initial investigative step. By June 23, investigators had conducted nine controlled cocaine purchases, obtained earlier interception orders, and used surveillance to follow suspected supply relationships from Cooney through Davis, Hayes, and Siler. True, those steps did not all target Buriel before the Government sought to wiretap his phone. (*See generally* Ex. 1, D3-000873–000897). But in *United States v. Gardner* the Sixth Circuit expressly rejected the claim that agents must exhaust traditional methods against *every* possible member of a suspected conspiracy before seeking interception of the target phones. 32 F.4th at 515–16 (noting that there is "no authority holding the government

[3] Branch does not argue that the investigators failed to use ordinary methods of investigation before tapping Siler's telephone; thus, the Court will only address necessity in reference to the Target Telephone possessed by Buriel. *See generally* ECF No. 217.

is required to exhaust traditional methods of investigation into all possible members of a conspiracy before applying for a wiretap.") (quoting *United States v. Jenkins*, 659 F. App'x 327, 335 (6th Cir. 2016)). In essence, the first factor concerns the course of the investigation, not whether the investigators personally used any specific technique against any one defendant. And, like in *Gardner*, investigators applied for a wiretap to identify other key personnel in the drug conspiracy. *Id.* at 516. Overall, the wiretap was not an initial step in the investigation.

Second, the affidavit explained why traditional investigative techniques were inadequate to achieve the investigation's remaining objectives. Paczok did not simply assert that other methods would fail. He identified the techniques investigators had used, the information those techniques had produced, and their limitations in identifying the suspected suppliers, customers, storage locations, and broader scope of the trafficking activity. (*See* Ex. 1, D3-000873–000897).

For instance, confidential sources and controlled purchases had been productive, but their access was limited. Two FBI sources had provided information concerning Cooney, including suspected associates and suppliers, and investigators had completed nine controlled cocaine purchases from her. (*Id.* at D3-000873–000876). But those sources could report only what Cooney disclosed or what they personally observed, and neither had reliable access to Siler's or Buriel's suspected trafficking activities. (*Id.* at D3-000873–000875). Paczok also explained that

additional controlled purchases from Cooney were unlikely to identify suppliers farther up the distribution chain, while arranging purchases directly from those higher-ups would require an established source whom investigators did not have. (*Id.* at D3-000874–000876).

Physical surveillance had likewise produced useful evidence without resolving the remaining questions. Investigators had observed meetings involving Siler and Hayes, including a brief encounter on May 8, and had corroborated suspected supply transactions through surveillance on April 28 and June 6. (*Id.* at D3-000877–000879). But surveillance is an investigative technique only "used to confirm meetings and other suspected criminal activity between alleged participants but often leaves the investigators with insufficient evidence to prove the purpose of the meetings and other activity." (*Id.* at D3-000877). So even continuing with these techniques, they work best in conjunction with other ones, such as a wiretap. (*Id.* at D3-000880). Pole cameras presented similar limitations. Cameras had been positioned to observe several relevant residences, including at Siler and Buriel's residences, but the recordings at those residences could not independently establish the purpose of the observed activity and all investigators could say is that the interactions were "consistent with drug trafficking activity." (*Id.* at D3-000887–000888).

The affidavit also addressed techniques that investigators had not fully employed but did consider. Paczok explained that an attempted opportunity to introduce an undercover agent had been unsuccessful and that it was highly unlikely that the undercover agent would have better access than the sources the investigators already had on the inside. (*Id.* at D3-000881). Search warrants might uncover drugs or other evidence at known locations, but investigators had not identified where Siler or Buriel stored narcotics, and premature searches would result in the arrest of only one or two people but not the principal targets of the investigation, the higher-ups. (*Id.* at D3-000882–000883). Interviews had produced some information, but further interviews and grand jury subpoenas risked disclosing the investigation to those higher up in the distribution chain. (*Id.* at D3-000884–000885).

Finally, investigators had used or considered less intrusive methods of collecting physical or communications based evidence, but those were still ineffective to meeting the needs of the investigation. For instance, a trash search at Cooney's residence produced evidence of cocaine distribution but did not identify the broader supply network, and further trash pulls would only tell investigators what they already knew through previous wiretaps and other investigative methods: that the people being investigated were involved in illicit drug dealing. (*Id.* at D3-000886). Vehicle tracking was difficult because several of the individuals had multiple cars or lived on tight and busy streets that made putting trackers on their

cars impracticable. (*Id.* at D3-000888–000889). And cellphone location information had established movements between individuals but not the purpose their meetings and could also be imprecise as to exact location where a particular individual went. (*Id.* at D3-000890). Pen registers, trap and trace devices, and toll records established frequency and identifying information regarding calls made from a particular telephone, but they could not be used to determine either who was called or the substance of their conversation; thus, they work best in conjunction with a wiretap. (*Id.* at D3-000890–000891). Investigators also conducted an investigation into Cooney's financial records, however, while those records did represent some suspicious activity, the investigators could not tell why a transaction was made. (*Id.* at D3-000896–000897). And previous wiretaps had identified additional suspected participants, but the investigation had not yet determined the full extent of the distribution chain and Buriel's supply relationships or where he stashed his drugs. (*Id.* at D3-000892–000896).

Taken together, these explanations were sufficient. Branch is correct that investigators had successfully used ordinary techniques against Cooney and others, and had not repeated every single one of them against Buriel. But the question is not whether some additional evidence could have been obtained, or even if all techniques had been exhausted. *See United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("[T]he mere fact that some investigative techniques were successful in

uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance."); *Alfano*, 838 F.2d at 163 ("[T]he government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted."). The affidavit explained why those several methods already employed were unlikely to identify additional suppliers, customers, and storage locations. That was enough to satisfy this factor.

Third, Paczok's explanations, while based on his personal experience, were tied to the particularities of this investigation. Paczok identified the sources actually used, the failed undercover approach, the surveillance undertaken, and the calls that implicated the target phones. As explained in *Fordham*, wiretap applications can rely on generalizations when "specific examples provide support along the way." 183 F.4th at 458 (quoting *Gardner*, 32 F.4th at 517). Thus, all factors support the June 23, 2025 necessity determination.

**B. The July 10, 2025 Wiretap Order**

**1. Probable Cause**

Next, turn to the July 10, 2025 wiretap. The telephone at issue in this wiretap application was Target Phone 13, belonging to Branch, and Target Phone 12, the telephonic communications of which the Defendants have not sought to suppress.[4]

---

[4] Seemingly, both the individual in possession of Target Telephone 12 and the communications it was involved in have been redacted. (*See* Ex. 2.).

Branch argues that the July 10 application repeated the same deficient means of establishing probable cause: that investigators established probable cause as to Cooney alone, and then treated each subsequent person as another cocaine supplier. (ECF No. 217, PageID.882–84).

First, it should be noted that the July 10 affidavit relied, in part, on the same investigation and intercepted communications discussed in connection with the June 23 order. Rather than incorporating those allegations by reference, Paczok reproduced the earlier evidence connecting Cooney, Davis, Hayes, Siler, and Buriel, including the communications and surveillance the Court has already discussed. (See Ex. 2, D3-000986–000999). The Court need not address the relevance of this evidence again.

But Paczok's affidavit also supplied the context for the new information connecting Target Telephone 13 to Buriel's suspected cocaine supply. The affidavit first identified a pattern of calls suggesting that the user of Target Telephone 13 supplied Buriel. On June 6, while Siler and Buriel were arranging a suspected cocaine transaction, Buriel called Target Telephone 13 within a minute of speaking with Siler. (*Id.* at D3-001008). Later that afternoon, around the time surveillance observed Siler returning from Buriel's residence (allegedly after picking up narcotics), Buriel again called Target Telephone 13. (*Id.*). Paczok believed that the intercepted sequence represented Buriel contacting his supplier, Branch, the owner

of Target Telephone 13, to tell him that he had the money owed for the controlled substances after the drug deal with Siler. (*Id.*). Although, it should be noted that it does not appear that the content of those phone calls was intercepted. (*See id.*)

Perhaps more significantly, interception of Buriel's telephone after the June 23 wiretap order produced conversations directly involving Branch using Target Telephone 13. On June 24, Buriel asked Branch whether "everything [was] together." (*Id.* at D3-001016). Branch responded that it had been, but "[e]verything moved again," and told Buriel that he had "missed out." (*Id.* at D3-001016–001017). Paczok interpreted the exchange as a discussion of narcotics that had already been sold before Buriel could get in on the action.

Minutes later, the two had another conversation. Buriel complained that his "people" argued with him when "it's broke up." (*Id.* at D3-001018). Branch discussed a change in "jersey number" from "28 to 36," referred to a "laundry mat," and suggested that something would happen within "the next day[] [o]r two." (*Id.*). Paczok explained why those statements suggested a discussion of cocaine quality and the process of converting powder cocaine into crack cocaine. (*Id.* at D3-001020–001021).

The same conversation also suggested an ongoing dealing relationship. Buriel asked whether Branch intended to "divorce" him, and he replied that they had a "long-term relationship." (*Id.* at D3-001019). Obviously, Branch and Buriel are not

married. Rather this exchange represents coded language so thinly veiled its true meaning appears obvious in context with other information learned throughout the investigation.

The pair also discussed another transaction in which Buriel had not participated because, as he put it, he was not "in that field." (*Id.* at D3-001019–001020). Paczok understood the exchange to concern a different type of narcotic for which Buriel lacked an established customer base. (*Id.* at D3-001022).

And telephone records supplied additional corroboration. Between June 1 and July 1, Target Telephone 13 had 120 calls with identified subjects, including 28 calls with an unindicted co-conspirator, whose residence had previously been searched and found to contain cocaine, crack cocaine, and fentanyl. (*Id.* at D3-001024–001025). The telephone also had contact with yet another unindicted co-conspirator who had a history of drug trafficking convictions. (*Id.* at D3-001025–001026). Paczok noted that the telephone had relatively few contacts and a low call volume, only having contact with sixteen other telephone numbers. (*Id.* at D3-001025).

Thus, the July 10 application did not simply carry forward probable cause established against Cooney or Siler as Branch suggests. The earlier investigation supplied context, while the newly intercepted conversations directly connected Branch and Target Telephone 13 to suspected narcotics transactions with Buriel. The timing of earlier calls and the telephone records corroborate that relationship.

Viewed together, the evidence established probable cause that Target Telephone 13 was involved in drug offenses.

**2. Necessity**

Branch argues that the July 10 application was deficient because the investigators did not conduct ordinary means of investigation before seeking the wiretap of his phone. (ECF No. 217, PageID.884). Again, the Court covers the factors from *Fordham*.

First, interception was not the initial step. Before seeking the wiretaps on July 10, investigators had already conducted controlled buys, surveillance, interpreted several interceptions, and conducted telephone record analysis. (*See generally* Ex. 2, D3-001028–001054). Those methods had identified suspected trafficking relationships extending from Cooney to Siler and Buriel, and the June 23 authorization had produced additional evidence concerning Buriel's suspected supplier, Branch. (*Id.* at D3-000986–000999, 001008–001026). Plus, as explained in *Gardner*, the Sixth Circuit does not require conventional techniques to be repeated against each newly discovered participant. 32 F.4th at 515–16. So, even if these tactics were not employed as to Branch himself, they were still utilized as part of the investigation. Thus, the first factor is satisfied.

Second, the affidavit explained why traditional investigative techniques remained inadequate. Much of this discussion repeated the explanations provided in

support of the June 23 order. Paczok again described the information obtained from confidential sources and controlled purchases involving Cooney and explained that neither method had provided reliable access to the suspected suppliers farther up the distribution chain because higher-up drug dealers would not necessarily conduct sales with people they did not already have a relationship with. (*Id.* at D3-001028–001032). He also addressed, again, physical surveillance, undercover agents, search warrants, interviews, grand jury subpoenas, trash searches, pole cameras, vehicle tracking, cellular location information, financial records, and toll and trap and trace records, and applied substantially the same reasoning for why those methods were insufficient for the investigative purpose involving the owners of the target telephones. (*See id.* at D3-001032–001054). As before, the major limitation was that these techniques could identify contacts, movements, and suspicious transactions without reliably establishing the participants' roles, their sources of drug supply, or where they stored narcotics. (*See id.* at D3-001032–001054).

The July 10 affidavit also contained additional information more immediately relevant to Target Telephone 13. For example, interception of Buriel's telephone had identified Branch as a suspected supplier and revealed conversations suggesting a long-term drug trafficking relationship. (*Id.* at D3-001050–001051). So interceptions of Target Telephone 13 would do better to understand Branch's relationship in the suspected illicit drug trafficking.

Additionally, Paczok explained why continuing to intercept Siler's and Buriel's telephones would not necessarily discovery more information as to Branch's involvement. The information obtained about Branch depended on what that individual was willing to disclose to Buriel, whose calls were already being intercepted. And Paczok believed that a supplier would be reluctant to identify his own source to a customer who might then bypass him. (*Id.* at D3-001050–001051). He further explained that the investigation had not identified where Branch stored narcotics, so a search warrant would not be useful until they determined that location. (*Id.* at D3-001038).

The affidavit also explained that investigators had not confirmed whether Branch was Buriel's only supplier or where Buriel stored his narcotics. (*Id.* at D3-001052). Similar questions remained concerning Siler's additional suppliers and storage locations. (*Id.* at D3-001052). Although the investigation had made substantial progress, those unresolved matters provided a reason to intercept the newly identified Target Telephone 13 rather than rely exclusively on communications involving persons farther down the suspected supply chain like Buriel or Siler.

Third, Paczok's affidavit tied his assessment from personal experience of the limitations of traditional methods to the circumstances of this investigation. Some explanations were substantially the same as those given on June 23, but repetition

did not make them inadequate. Indeed, the Sixth Circuit has said that application should not be rejected merely because they contain generalizations; instead, a court should determine whether "specific examples provide support along the way." *Gardner*, 32 F.4th at 517. And specific examples were provided as noted above. So the issuing judge could reasonably conclude that further interception was necessary to investigate Branch's suppliers, associates, and trafficking locations.

Accordingly, the July 10 application satisfied Title III's necessity requirement.

**C. The July 23, 2025 Wiretap Order**

**1. Probable Cause**

Turn finally to the July 23, 2025 wiretap. This wiretap concerned Target Telephone 14[5], possessed by Turner. Moultrie argues that there was no evidence against him in the alleged drug conspiracy until the investigators overheard wiretapped conversations involving him and Turner. (ECF No. 247, PageID.1359). His arguments are largely the same as Branch's from the previous two wiretaps: that the probable cause and investigative techniques were only pertinent to Cooney, and that the investigators improperly implied probable cause to everyone else down the distribution chain based on Paczok's reading of the intercepted conversations. (ECF

[5] Although the July 23, 2025 order also extended interception of Buriel's Target Telephone 11, Defendants do not appear to independently challenge the probable cause or necessity supporting that extension. Thus, the Court confines its analysis of the July 23, 2025 order to the authorization concerning Turner's Target Telephone 14.

No. 247, PageID.1361–63). As to Turner, he chiefly challenges necessity and the attribution of Target Telephone 14 rather than developing a separate probable cause argument in his supplemental brief. (*See generally* ECF No. 269).

As with the July 10 application, Paczok reproduced much of the evidence supporting the earlier wiretaps. The affidavit again described the investigation beginning with Cooney, the suspected supply relationships involving Davis, Hayes, Siler, and Buriel, and the intercepted communications establishing those relationships. (Ex. 3, D3-001125–001142). That evidence has already been addressed and the Court has already explained the context it provided to the issuing judges for the different wiretap orders, so that information need not be fleshed out again. What matters here is the additional information connecting Turner and Target Telephone 14 to alleged illicit drug dealing.

And the affidavit introduced several pieces of new information. For instance, on July 15, Buriel called Branch and asked whether Branch could "pick me up." Branch declined, explaining that his truck was unavailable but should be running again that day or the next. (*Id.* at D3-001143–001144). Later that afternoon, Buriel spoke with Matthew Jones[6], whom investigators believed Buriel supplied. Buriel

---

[6] Matthew Jones was indicted in this case on August 13, 2025, along with Turner, Branch, Buriel and Moultrie, (*see* ECF No. 1), and was charged again in first and second superseding indictments, (*see* ECF Nos. 58, 74). Jones took a Rule 11 plea agreement on March 19, 2026, (ECF No. 178), and was sentenced on July 20, 2026.

told Jones that he had heard from "my man," who would be available that day or the next, and that he would call his "other partner" to see whether he had some "fire too." (*Id.* at D3-001144). Paczok understood the first reference to concern Buriel's attempt to be resupplied by Branch, who was unable to do so, but, based on the phone call with Jones, he would seek resupply from another supplier he knew. (*Id.* at D3-001143–001145).

Enter Turner. Just three minutes later, Buriel called Turner on Target Telephone 14. (*Id.* at D3-001145). He asked Turner if he was "at work," but Turner told him that "[i]t'll be tomorrow," however, Buriel was "on [his] list" and that he would have some "smoke…for sure." (*Id.* at D3-001146). Buriel then called Jones back and reported that "everybody say tomorrow." (Id. at D3-001147). The timing of those calls supported Paczok's belief that Turner was the other supplier Buriel had just mentioned to Jones. It also provided evidence specific to Target Telephone 14, rather than merely extending suspicions arising from Cooney's trafficking activity, as Moultrie argues.

The conversations continued that afternoon. Turner called Buriel again and said that the wait might instead be "a couple hours." (*Id.* at D3-001148). Buriel immediately relayed that development to Jones, telling him that the person he had spoken with would be ready in a couple of hours and that he would call Jones "soon as it touch me." (*Id.* at D3-001148–001149). Paczok interpreted this sequence as

further proof that Turner sought to supply Buriel who would then supply Jones with narcotics. (*Id.* at D3-001149). Buriel and Turner would keep conversing in ways that Paczok believed indicated that Turner was checking in to see if Buriel had contacted his clients to see if they wanted illicit drugs. (*Id.* at D3-001149–001150). Buriel would then call back Jones, and tell him that he was "ready," and confirmed that Jones wanted "just one." (*Id.* at D3-001150–001151). Paczok believes this conversation was Buriel confirming that Jones was still interested and the quantity of controlled substances that he wanted. (*Id.* at D3-001151). Additionally, more conversations involving Hayes, Siler, and Buriel were intercepted around this time that Paczok believes is indicative of the trios continued illicit drug dealings with each other. (*Id.* at D3-001151–001157).

The affidavit also described another direct exchange between Turner and Buriel on July 17. In that call, Turner offered Buriel "one laying around for fifteen five," and Buriel responded that he would "slide by" after he finished "knock[ing] this little stuff out." (*Id.* at D3-001158). Here, the coded language is so thinly veiled that the inference of drug trafficking is obvious. As Paczok explained, Turner's offer represents one kilogram of cocaine for $15,500, which is consistent with the price of a kilogram of cocaine. (*Id.* at D3-001159).

Telephone records supplied additional corroboration. Between June 17 and July 17, 2025, Target Telephone 14 had 142 calls with target subjects or interceptees.

(*Id.* at D3-001161). Twenty-three were with one individual whom investigators also suspected of drug trafficking. (*Id.* at D3-001161–001162). And at least twice, Turner has had contact with this individual close in time to calls with Buriel, where investigators believe that Turner attempted to sell controlled substances to Buriel. (*Id.* at D3-001162).

Taken together, the evidence supported more than an inference of guilt by association. The July 15 sequence connected Turner's telephone to Buriel's efforts to obtain a supply for Jones, and the July 17 conversations provided further evidence of a suspected cocaine transaction. The continued communications involving Buriel, Jones, Siler, and Hayes supported the conclusion that Buriel was still using Target Telephone 11 for drug trafficking. Considering the affidavit as a whole, the issuing judge had a substantial basis to find probable cause that Turner used Target Telephone 14 to traffic drugs.

**2. Necessity**

Next, turn to necessity. Turner argues that the July 23 affidavit failed to establish necessity because investigators relied on generalized explanations from earlier applications without adequately considering traditional investigative techniques directed at him. (*See generally* ECF No. 269). Additionally, he contends that investigators overlooked opportunities for information arising from his federal

supervised release. (ECF No. 269, PageID.1585–87) The Court again considers the three factors identified in *Fordham*.

First, the July 23 application was not the Government's initial investigative step. As stated before, by July 23, investigators had conducted controlled purchases, physical surveillance, telephone record analysis, and successive interceptions that identified suspected trafficking relationships extending from Cooney through Buriel and Branch. (Ex. 3, D3-001125–001162). And recent interception of Buriel's telephone had identified Turner as a suspected supplier, while telephone records revealed his contacts with other suspected traffickers. (*Id.* at D3-001144–001163). Although those techniques had not all been directed at Turner, the investigation had progressed substantially before the Government sought authorization to intercept Target Telephone 14. The first factor is satisfied.

Second, the affidavit explained why traditional investigative techniques remained inadequate. Much of this discussion repeated the explanations supplied in the earlier applications concerning confidential sources, controlled purchases, physical surveillance, undercover operations involving agents, search warrants, interviews, grand jury subpoenas, trash searches, pole cameras, vehicle tracking, cellular location information, and telephone records. (*Id.* at D3-001165–001190). The Court has already addressed those techniques and need not address the general

limitations of each one as presented by the affidavit again. The July 23 affidavit, however, also identified investigative developments specific to Turner.

Paczok explained that the prior interception of Buriel's telephone had identified Turner and Branch as suspected suppliers but had not established where Turner obtained or stored narcotics or the full extent of his trafficking activity. (*Id.* at D3-001187–001188). Like with other individuals allegedly higher-up in the drug trade, information concerning Turner was limited to what he disclosed to Buriel and what investigators could infer from surveillance and telephone records. (*Id.* at D3-001187–001188). And, like in his previous affidavits, Paczok believed Turner was unlikely to identify his own supplier to Buriel because doing so could allow Buriel to bypass him. (*Id.* at D3-001187). Moreover, Turner and Branch appeared to be separate suppliers for Buriel, with no known direct connection between them. (*Id.* at D3-001188). Thus, monitoring Branch's telephone was unlikely to reveal Turner's suppliers or trafficking locations. (*Id.* at D3-001188).

Turner responds that these explanations largely repeated language from earlier applications, particularly the assertion that suppliers are reluctant to identify their own sources and that the Defendants are careful over the phone (*Id.* at PageID.1583–85). He is correct that portions of the affidavit were carried forward, sometimes with little more than a change in the named subjects. But, as noted before, repetition does not itself render a necessity showing inadequate. Indeed, "Title III doesn't require

investigators to show why one drug investigation is unique or distinguishable from all others." *Gardner*, 32 F.4th at 518. Rather, it only requires the Government to prove why, in that specific case, "certain traditional techniques have 'been tried or failed' or appeared 'unlikely to succeed.'" *Id.* (citing 18 U.S.C. § 2518(1)(c)). The affidavit must be considered as a whole, and generalized explanations may suffice when supported by facts specific to the investigation. *See Fordham*, 183 F.4th at 456. Here, the intercepted conversations identified Turner as another suspected supplier to Buriel, while the absence of a known connection between Turner and Branch explained why the existing interceptions were unlikely to establish Turner's own supply network. (Ex. 3, D3-001143–001163, 001187–001188). Therefore, the affidavit supplied more than a generalized assertion that additional wiretaps would be useful.

Turner also faults investigators for failing to pursue ordinary techniques specifically against him. (ECF No. 269, PageID.1589–90). But investigators either used these techniques or explained why they would not work. The affidavit acknowledged that investigators lacked a confidential source with reliable access to Turner, making controlled purchases impracticable. (Ex. 3, D3-001166–001168). And because a specific location where Turner allegedly stored his narcotics had not been uncovered, a search warrant on any location would largely be fruitless. (*Id.* at D3-001174). Additionally, grand jury investigation or subpoena would be unhelpful

because Turner was likely to invoke the Fifth Amendment if brought in to testify. (*Id.* at D3-001176). Paczok also argued that trash pulls would not be helpful because the investigation had already "revealed" Turner as a drug dealer, so pulling narcotics from his trash would not tell the investigators any more than what they already knew. (*Id.* at D3-001178). The affidavit also disclosed that a pole camera had been positioned to observe Turner's residence, that his vehicle had not yet been identified for tracking, and that investigators had obtained location information for his telephone. (*Id.* at D3-001179–001182).

Turner argues that the affidavit did not explain what the pole camera or location data revealed, why those methods had not identified his vehicle, why investigators did not pursue trash searches or financial records despite identifying payment accounts associated with his telephone, and several other limitations in the investigation's methods. (ECF No. 269, PageID.1587–89). But Title III does not require investigators to exhaust every available method against each newly identified suspect. *See Gardner*, 32 F.4th at 516. And Title III does not require investigators to establish that conventional techniques could not produce additional evidence. *See Stewart*, 306 F.3d at 305–06. Rather, the relevant inquiry is whether the affidavit adequately explained why those techniques were insufficient to accomplish the investigation's remaining objectives, *i.e.* determining the rest of the individuals involved in, and the scope of, the drug trafficking scheme. *See Gardner*, 32 F.4th at

516–18. The affidavit explained that the methods employed and identified Turner as a suspected supplier but could not determine his sources, the locations where he stored narcotics, or the full scope of his activities. Those unresolved questions supported the need for interception.

Turner argues that investigators could have consulted his probation officer concerning his residence, vehicle, or other information that was absent from the affidavit. (ECF No. 269, PageID.1585–87). The affidavit acknowledged Turner's supervised release status but did not explain whether investigators considered those alternatives. (Ex. 3, D3-001118–00119). The omission is relevant, particularly because investigators had not identified his vehicle or narcotics storage locations. But Turner's conditions required truthful reporting to his probation officer, permitted probationary visits, and confiscation of contraband observed in "plain view," however, there is no indication that the conditions of his supervised release allowed unrestricted searching of his residence. (ECF No. 269, PageID.1585–87). Nor would routine, probationary supervision necessarily disclose his supplier or the scope of the suspected trafficking network. And although investigators could have pursued inquiries related to his probationary status, the necessity requirement did not oblige them to exhaust those possibilities before seeking interception. *See Alfano*, 838 F.2d at 163–64.

There is one more wrinkle. Turner correctly identifies an apparent inconsistency in the affidavit's discussion of search warrants. While Paczok stated that no search warrants for physical locations had been executed in the investigation, (D3-001171), earlier in the affidavit Paczok noted the March 2025 search of Siler's residence and associated storage units which uncovered drugs. (ECF No. 269, PageID.1589; Ex. 3, D3-001115). Turner believes this omission or misstatement is analogous to those made in *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007). (ECF No. 269, PageID.1589). But this situation is not analogous. In *Rice*, the district court determined that that the affidavit contained "misleading" and "reckless" statements. 478 F.3d at 707–09. It determined that, without those misleading statements, only "uncorroborated thoughts and opinions" remained. *Id.* at 709. So the affidavit provided "no evidence that any other investigative technique was…seriously considered," and the evidence was suppressed. *Id.* at 709–11. The Sixth Circuit affirmed the district court on these grounds. *Id.* at 711.

But here, discrepancy between whether a search occurred or didn't on March 5, 2025 appears less "misleading" or "reckless" and more like a misstatement, especially because the March 5 search is mentioned multiple times throughout the affidavit. (Ex. 3, D3-001115, 001140, 001173). Even if Turner were correct, discounting the statements about the fruitlessness of a search warrant, the affidavit still successfully described the results and limitations of other investigative methods

and explained why the newly identified supply relationship between Turner and Buriel warranted further investigation. Thus, this argument fails.

Third, and finally, Paczok tied his personal experience in the affidavit to the circumstances of this investigation. Although portions of the necessity discussion were repeated from earlier applications, Paczok identified specific developments supporting the July 23 request: intercepted conversations indicating that Turner supplied Buriel, the identification of Branch as a separate supplier, the absence of a known connection between Turner and Branch, and the remaining uncertainty concerning Turner's own source and trafficking locations. (*Id.* at D3-001143–001163, 001187–001188). These circumstances explained why the existing interceptions, despite their success, were unlikely to achieve the investigation's remaining objectives. The issuing judge could reasonably conclude that intercepting Target Telephone 14 was necessary. Accordingly, the July 23 application satisfied Title III's necessity requirement.[7]

**D. Other Challenges**

---

[7] Turner also argues that, if the June 23, 2025 interception order was unlawful, the communications intercepted under the July 23, 2025 order and the evidence later seized from the search of his Niagara Street residence must be suppressed as derivative evidence. (ECF No. 269, PageID.1591–93.) Indeed, the Sixth Circuit has held that evidence from an illegal wiretap cannot be used to support a subsequent wiretap and may lead to that wiretap's suppression. *See United States v. Wac*, 498 F.2d 1227, 1231–32 (6th Cir. 1974). But because the Court concludes that the June 23 interception order satisfied Title III, Turner's derivative suppression argument fails at the start.

**1. Interception of Unidentified Callers and Minimization**

Past their probable cause and necessity arguments, the Defendants raise others; however, none of them are persuasive. Branch argues that agents could not lawfully intercept his conversations over Buriel's telephone before independently suspecting him of wrongdoing. He invokes the Supreme Court's newly decided decision in *Chatrie v. United States*, 609 U.S. 605 (2026). (ECF No. 217, PageID.885–87). Moultrie makes substantially the same argument. (ECF No. 247, PageID.1364–66). *Chatrie*, however, is inapplicable to this instant case.

*Chatrie* addressed government acquisition of location data around a crime scene, often times referred to as a "geofence." 609 U.S. at 610. The situation in *Chatrie* is a good example of this investigative technique. There, investigators got a geofence warrant to receive the location history of all the cellphones around the area of a bank robbery. *Id.* at 611. From there, they were able to determine and eventually charge a suspect. *Id.* But the issue in front of the Supreme Court was narrow: was the geofence a search under the Fourth Amendment? *Id.* The Supreme Court answered this question in the affirmative. *Id.* However, the separate question of whether the search was reasonable or not was sent back on remand for the lower court to decide. *Id.* This rather narrow holding does little work, if any, for the Defendants in this case.

For starters, the Supreme Court has held that a valid Title III order may intercept communications involving persons not identified in the application. In *United States v. Kahn*, 415 U.S. 143 (1974), the government obtained authorization to intercept communications over telephones used by a suspected bookmaker. In that authorization, the government was allowed to intercept communications with "others at yet unknown," *id.* at 145, which is language similar to that found in all three of the wiretap orders in question before the Court today, (Ex. 1, D3-000796, Ex. 2, D3-000945, Ex. 3, D3-001093). In *Kahn*, investigators intercepted incriminating conversations involving the target's wife, whom they had not originally suspected of participating in the offense. *Id.* at 145–49. The Court held that Title III's identification provisions did not require the government to name an individual it had no reason to suspect was involved in the crime when the order issued. *See id.* at 152–55 ("We conclude, therefore, that Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought."). That's because the relevant statutory text of the Omnibus Crime Control and Safe Streets Act of 1968 "require(s) identification of the person committing the offense only 'if known.'" *Id.* at 157. So it is of no moment that Branch or Moultrie may have been previously unknown before their communications with other individuals legally wiretapped were intercepted. And

*Chatrie's* holding only attests to whether a geofence, a technique not relevant here, is a search and nothing more. Indeed, to the extent that Branch and Moultrie believe that *Chatrie* somehow overruled *Kahn*, and might be somehow relevant to their case, that is not for this Court to decide. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."). This argument necessarily fails.

Branch also challenges the Government's compliance with Title III's minimization requirement, arguing that the Government has not demonstrated that monitoring agents properly minimized interceptions. (ECF No. 217, PageID.887.) But § 2518(5) requires reasonable minimization, not the exclusion of every conversation ultimately determined to be unrelated to the investigation. As the Supreme Court explained, "[t]he statute does not forbid the interception of all nonrelevant conversations," because agents cannot always determine a call's relevance before it ends, particularly when conversations are brief, ambiguous, or coded. *Scott v. United States*, 436 U.S. 128, 140 (1978). Compliance is assessed in light of the circumstances confronting the monitoring agents in each case. *Id.* The Sixth Circuit has further clarified that "[i]t is not enough for the defendants to

identify particular calls which they contend should not have been intercepted"; rather, they "must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (quoting *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill. 1982)). Here, Branch identifies no particular innocent conversations that agents improperly intercepted, much less a pattern of unnecessary monitoring. Indeed, at the hearing, both Branch's and Moultrie's counsel were asked whether they could identify any calls that were not properly minimized, but they could not. So Branch's generalized challenge does not establish a minimization violation warranting suppression, and this argument fails.

**2. Branch's Reply Brief and Request for a *Franks* Hearing**

In his reply brief, Branch contends that Paczok's references to a drug trafficking "organization" were recklessly, if not intentionally, deceptive because the affidavits did not establish that all participants belonged to a formal organization. (ECF No. 281, PageID.1652–53). Branch argues that the characterization improperly allowed the probable cause and necessity showing concerning Cooney to carry over to Buriel and Branch, and he requests a Franks hearing. (ECF No. 281, PageID.1652–53). The Court has already covered this argument, and explained that whether a formal illicit organization existed or not was not relevant for the independent findings needed for the probable cause and necessity showings relevant

to the wiretap application. More troubling, however, is that Branch appears to argue that he has grounds for a *Franks* hearing.

However, Branch has not made the showing necessary for a *Franks* hearing. Indeed, a defendant is only entitled to a *Franks* hearing if they "1) make[] a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and 2) prove[] that the false statement or material omission is necessary to the probable cause finding in the affidavit." *United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)). The word "organization" expressed Paczok's understanding of the suspected trafficking relationships, supported in part by intercepted calls and the earlier controlled purchases and searches. Branch identifies no evidence that Paczok knowingly misrepresented a particular fact or recklessly concealed the absence of a drug related hierarchy. Indeed, at the hearing, neither Branch nor Moultrie's counsel pointed to evidence indicating such.

More importantly, the necessity and probable cause findings stand on the specific facts discussed above, even without treating the suspects as members of one organization. *See Franks*, 438 U.S. at 171–72 ("Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit

to support a finding of probable cause, no hearing is required.”). Thus, there is no need for a *Franks* hearing, if Branch requests one, on these grounds.

**3. Turner’s Discovery and Hearing Requests**

Finally, Turner asks the Court to compel records concerning the attribution of Target Telephone 14 to him, including subscriber information, financial records from PayPal and CashApp, tracking warrant materials, toll and pen register records, and other interception materials. (ECF No. 269, PageID.1594–95). The Government represents that it produced the requested materials on October 6, 2026. (ECF No. 276, PageID.1639). At the hearing, Turner indicated that the Government’s production had mooted this request. Therefore, the Court will address this matter no further.

Turner also asks to question Agents Paczok and another agent, Troy Wohlfert, at an evidentiary hearing and to file further briefing. (ECF No. 269, PageID.1594–96). Likewise, Branch and Moultrie join in on this request. (ECF No. 273, PageID.1608; ECF No. 274, PageID.1611). But Turner expressly states that he “does not ask for a *Franks* hearing on the present record,” (*id.* at PageID.1594), which his counsel again represented at the hearing. And for good reason: he has not made the substantial preliminary showing of a deliberately or recklessly false, material affidavit statement that *Franks* requires. *See Rose*, 714 F.3d at 370. Nor has he identified a disputed material fact that requires testimony to decide the probable

cause or necessity questions. Those questions can be resolved from the applications and the Parties' submissions. The possibility that questioning the agents *might* uncover a new argument is not itself a basis to question them. So Turner's requests for an evidentiary hearing, agent testimony, and any additional information from the Government, or briefing after the hearing will be denied.

**IV. Conclusion**

Accordingly, Branch's motion to suppress (ECF No. 217), joined by Turner (ECF No. 233) and Moultrie (ECF No. 234), is **DENIED**.

Further, the additional suppression challenges raised in Moultrie's and Turner's supplemental briefs (ECF Nos. 247, 269) are also **DENIED**.

Further, Turner's requests for additional discovery, an evidentiary hearing, testimony from the agents, and further briefing are **DENIED.**

Further, any request from Branchs for a *Franks* hearing is also **DENIED.**

Dated: November 13, 2026

s/Robert J. White
Robert J. White
United States District Judge